FILED

2010 APR 30 PM 3: 18

U.S. DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
FORT MYERS, FLORIDA

UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
FT. MYERS DIVISION

**PRINTESS RIPLEY, JR.,**
**Plaintiff,**

v.  Case No. 2:08-CV-947-FtM-DNF

**MICHAEL J. ASTRUE,**
**Commissioner of Social Security,**
**Defendant.**
_____/

## OPINION AND ORDER[1]

The plaintiff, Printess Ripley, Jr., pursuant to 42 U.S.C. § 405(g), seeks judicial review of the final administrative decision of the Commissioner of Social Security ("Commissioner") denying his claim for Social Security disability insurance ("SSDI"). The plaintiff was approved for benefits with an onset date of disability commencing on January 18, 2008, based on a March 20, 2007, application for benefits. The period at issue before this Court is from plaintiff's alleged onset date of December 30, 2002, through January 17, 2008. (Tr. 7).

The Plaintiff protectively filed an application for a period of disability and disability insurance benefits on November 10, 2004 (Tr. 59). This application was denied initially and upon reconsideration (Tr. 24, 25). The Plaintiff requested a hearing before Administrative Law Judge (ALJ), William F. Clark who issued an unfavorable decision on January 24, 2007. (Tr. 11-21). The Plaintiff requested a review of the decision, which was denied by the Appeals Council on October 31, 2008. (Tr. 6-8).

---

[1] Both parties have consented to the exercise of jurisdiction by a magistrate judge, and the case has been referred to the undersigned by an Order of Reference dated April 13, 2009.

The Commissioner has filed the Transcript of the proceedings (hereinafter referred to as "Tr." followed by the appropriate page number), and the parties have filed legal memoranda.

For the reasons set forth below, the Court finds that the Commissioner's decision must be **REVERSED** and **REMANDED**.

### I. Social Security Act Eligibility, the ALJ Decision, and Standard of Review

The law defines disability as the inability to do any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months. 42 U.S.C. § § 416(I), 423(d)(1); 20 C.F.R. § 404.1505. The impairment must be severe, making the claimant unable to do his previous work, or any other substantial gainful activity which exists in the national economy. 42 U.S.C. § 423(d)(2); 20 C.F.R. § § 404.1505-404.1511. The Plaintiff bears the burden of persuasion through Step 4, while at Step 5 the burden shifts to the Commissioner. *Bowen v. Yuckert*, 482 U.S. 137, 146 n.5 (1987).

The Plaintiff requested review of the ALJ's hearing decision on March 7, 2007.[2] In a Notice dated October 31, 2008, the Appeals Council denied the request for review, affirming the Plaintiff's subsequent approval for disability commencing on January 18, 2008, based on his March 20, 2007 application, but declared that "this information does not warrant a change in the [ALJ's} decision." (Tr. 6-9). Accordingly, the ALJ's decision became the Commissioner's final decision.

---

[2] The Plaintiff's counsel submitted a letter brief contending that the ALJ had not conducted a fair and impartial hearing; had not afforded proper weight to the opinion of Dr. Axline; improperly gave controlling weight to the medical expert's opinion; and that he did not specify which of the Plaintiff's work skills transferred to the jobs identified that he could perform. (Tr. 313-339).

On January 24, 2007, the ALJ issued a decision denying the Plaintiff's claim for benefits. (Tr. 21). The ALJ determined that the Plaintiff met the insured status requirements of the Social Security Act through December 31, 2008. (Tr. 16). At Step 1, the ALJ determined that Plaintiff had not engaged in substantial gainful activity since December 30, 2002, the alleged onset date .(20 C.F.R. 404.1520(b) and 404.1571, *et. seq.)*.. At Step 2, the ALJ found that the plaintiff has the following severe impairment: Atrial Fibrillation. (20 C..404.1520(c)). The ALJ found that there was no evidence of record to support the contentions that plaintiff's complaints of back and knee pain caused any functional limitations and thus found that they are non-severe. At Step 3, the ALJ determined that the plaintiff does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1. (20 C.F.R. 404.1520(d), 404.1525 and 404.1526). At Step 4, the ALJ determined the plaintiff is able to perform skilled and unskilled work at the light and sedentary exertional levels. The ALJ found the plaintiff is not precluded from performing all work-related activities. [Tr. 17]. At Step 5, the ALJ determined the plaintiff has the residual functional capacity ("RFC") to work at the light exertional level with restrictions that the plaintiff should never climb ladders, ropes or scaffolding; and should avoid extreme temperatures, humidity, fumes, odors, chemicals, gases and smoke.

The scope of this Court's review is limited to determining whether the ALJ applied the correct legal standards, *McRoberts v. Bowen*, 841 F.2d 1077, 1080 (11th Cir. 1988), and whether the findings are supported by substantial evidence, *Richardson v. Perales*, 402 U.S. 389, 390 (1971). The Commissioner's findings of fact are conclusive if supported by substantial evidence. 42 U.S.C. § 405(g). Substantial evidence is more than a scintilla; i.e., the evidence must do more than merely create a suspicion of the existence of a fact, and must include such relevant evidence as a reasonable

person would accept as adequate to support the conclusion. *Foote v. Chater*, 67 F.3d 1553, 1560 (11th Cir. 1995), *citing Walden v. Schweiker*, 672 F.2d 835, 838 (11th Cir. 1982) and *Richardson*, 402 U.S. at 401.

Where the Commissioner's decision is supported by substantial evidence, the district court will affirm, even if the reviewer would have reached a contrary result as finder of fact, and even if the reviewer finds that the evidence preponderates against the Commissioner's decision. *Edwards v. Sullivan*, 937 F.2d 580, 584 n.3 (11th Cir. 1991); *Barnes v. Sullivan*, 932 F.2d 1356, 1358 (11th Cir. 1991). The district court must view the evidence as a whole, taking into account evidence favorable as well as unfavorable to the decision. *Foote*, 67 F.3d at 1560; *accord, Lowery v. Sullivan*, 979 F.2d 835, 837 (11th Cir. 1992) (court must scrutinize the entire record to determine reasonableness of factual findings).

## II. Review of Facts and Conclusions of Law

**A.     Background Facts:**

The plaintiff was born on October 24, 1943. (Tr. 70). He was 61 years old, "advanced in age," when he filed his application for benefits, and was 63 years old when the ALJ rendered his decision in this case. The plaintiff is a college graduate who worked for 30 years as regional, then national, sales manager for two manufacturing companies. (Tr. 80-82, 103-105, 348-350). He has a consistent and significant earnings record through 2002 and is insured for benefits through December 2008. (Tr. 60-66, 70).

The medical evidence of record shows that within the five year period prior to the Plaintiff's alleged disability onset date of December 30, 2002, and prior to his relocation to Florida from

Maryland, he underwent two surgeries for facial skin cancer, with no recurrence noted in the medical records of February 1999. (Tr. 227-256). In addition, during an initial consultation in June 1997, the treating oncologist noted that the plaintiff had "repair of left knee twice, once at the age of 14 and other with reconstruction at the age of 44 . . . secondary to a hunting accident during which the plaintiff suffered a close range shot gun blast to the knee," and that his "right arm was operated on two years ago to repair a bicep injury." (Tr. 232). The physician also observed incisions in the plaintiff's right arm and left knee and that the "left knee is also somewhat misshaped" and was "more active than the right." (Tr. 233).

Approximately seven months prior to the plaintiff's move to Florida, he was found to have an irregular heart rhythm/atrial fibrillation after reporting to his treating physician, Joseph Adams, M.D.. The plaintiff advised Dr. Adams that he was also experiencing severe diarrhea and generalized weakness. (Tr. 166). A review of EKG testing, and examination conducted by cardiologists Ronald Schechter, M.D. and Joseph Ricely, M.D., on February 14, 2002, upon referral from Dr. Adams, revealed: "atrial fibrillation[3] of 92 beats per minute;" a heart rate of "90 and rhythm is irregularly irregular;" "heart tones are irregularly irregular;" mild left atrial and left ventricular dilatation; moderate aortic insufficiency; and mild mitral insufficiency. (Tr. 167, 176, 177). Dr. Schechter offered various options to the plaintiff, including an attempt to convert him to normal sinus rhythm, which had about a 50% success rate. Dr. Schechter added Toprol to plaintiff's other medications of Coumadin, "Glucosamine and Chondrotin sulfate," prescribed by Dr. Adams "for arthritic pains."

---

[3] Atrial fibrillation is described as "[i]ntermittent rapid irregular atrial rhythm due to multiple recentrant wavelet." *The Merck Manual*, 1724 (17th ed. 1999).

(Tr. 1666-168). The plaintiff agreed to "proceed with a stress test followed by attempts at converting to sinus rhythm, and later that month he underwent the cardiac stress test and a myocardial perfusion study. (Tr. 168, 171, 172). The stress test revealed no abnormalities, but the myocardial perfusion study showed atrial fibrillation and "rare single PVC's." (Tr. 171, 172).

Dr. Schechter successfully converted the plaintiff to normal sinus rhythm during hospitalization at Greater Baltimore Medical Center, on June 5, 2002, but plaintiff was to be maintained on Tambocor. (Tr. 164, 165). In July 2002, another EKG confirmed conversion back to "atrial fibrillation with rapid ventricular response rate of 115 beats per minute." (Tr. 162, 173,174). Borderline hypertension of 145/85, was also noted. (Tr. 162). The plaintiff's medication of Tambocor was increased and he was restarted on Coumadin. (Tr. 163). Dr. Schechter advised him to get a blood test as soon as possible upon his arrival in Naples, Florida, and gave him the name of a cardiologist colleague for him to see "in early follow up."

In August 2002, the plaintiff underwent a 24-hour ambulatory EKG monitor under the care of Daniel Goldman, M.D., of the Southwest Florida Heart Group, which showed a probable "atrial flutter with variable AV block" ("at times questionably atrial fibrillation"), "two hours where the average heart rate is over 100 beats per minutes," and "two isolated PVCs," but "no patient activated events." (Tr. 142). The plaintiff's medications at the time were Tambocor, Coumadin, and Claritin. *Id.* Dr. Goldman's next office record is dated May 7, 2003, and consists of a letter informing Daniel Drew, M.D., of the plaintiff's cardiac issues and stating that he was doing well on medical therapy at that time, "working on his exercise" and "working on his diet." (Tr. 132). He was continuing on medications of Claritin, Coumadin, Atenolol, and Altace. Dr. Goldman ordered another echocardiogram on May 14, 2003, which showed left atrial dilatation, mild mitral valve regurgitation, moderate aortic valve regurgitation, and minimal pulmonic valve regurgitation. (Tr. 134, 135).

In August 2003, William Miles, M.D., apparently took over for Dr. Goldman, informing Dr. Drew that the plaintiff was still being followed at the "Heart Group" for moderate aortic insufficiency. (Tr. 130). Dr. Miles indicated that the plaintiff's May 14, 2003 echocardiogram was similar to an echocardiogram report from January 2002. He also reported that the plaintiff "had an episode of syncope about one year ago for which he had seen Dr. Goldman upon his return to town," when "the patient decided that he could no longer do the job that he had involving much travel, poor dietary opportunities and a lot of stress." Dr. Miles' examination was unremarkable except there was "evidence of previous left knee injury." An EKG conducted on that date showed "one premature atrial contraction," but was otherwise normal. (Tr. 131, 144). Also, Dr. Miles completed an Attending Physician's Statement form for the Canada Life Insurance Company, indicating that the plaintiff could sit and stand intermittently for three hours each; could walk intermittently for 2 hours; could frequently lift up to 30 pounds; and could perform all listed postural activities. (Tr. 276). However, he indicated that he had not advised the plaintiff to return to work because, "[P]t's history of syncope interferes with his previous employment." (Tr. 277).

Dr. Miles again informed Dr. Drew in January 2004, that the plaintiff was doing relatively well, but complained that "he does occasionally have some days when he is somewhat overly tired," and that he "had some problems recently with the right ankle." (Tr. 129). Examination showed a pulse of "86 and irregular;" "changes in his left knee;" "some hardening posteriorly in the region of his right Achilles tendon;" and a "12-lead ECG shows atrial fibrillation with ventricular rate of 98 beats/minute." (Tr. 129). His current therapy was continued with medications of Claritin, Coumadin, Atenolol, and Altace. In July 2004, Dr. Miles again noted that the plaintiff complains of "a little bit more fatigue than he would like to have," but informed Dr. Drew that he was "stable," with a pulse

of "64 and irregular." (Tr. 128). Dr. Miles ordered another echocardiogram which was administered on July 16, 2004, showing mild left ventricular hypertrophy, left atrial dilatation, mild mitral valve regurgitation, mild pulmonary hypertension, moderate aortic valve regurgitation, and minimal pulmonic regurgitation. (Tr. 126, 127). In addition, medical records from the "Heart Group" also contain a record of the plaintiff's Coumadin treatment dated from December 2002 through January 2005. (Tr. 136-141).

As indicated above, the plaintiff was treated by Dr. Drew during the foregoing period, through July 2004. Although Dr. Drew's office notes are highly illegible, they do reflect that the plaintiff was seen for swollen left eye, a left eye lump, itchy rash, swollen ankle, right foot and heel pain, headaches, and congestion. (Tr. 178-184). Dr. Drew's diagnoses included Achilles bursitis, stye, dermatitis, and acute sinusitis. (Tr. 179-182). X-rays dated July 22, 2003, ordered by Dr. Drew, confirm calcaneal spurs on the right heel, and degenerative changes of the right ankle. (Tr.160, 161)

The medical records attributed to Hugh Calkins, M.D., of Clinical Associates/Johns Hopkins Medicine, indicate the plaintiff moved back to Maryland, and was seen in March and May 2005 when he complained of easy bruising, sinus stuffiness, hay fever, palpitations, left knee stiffness and joint pain, limited motion, cold intolerance, changes in hair and nails, and impotence. (Tr. 153). An abnormal ECG dated May 18, 2005, showed atrial fibrillation, and previously, on May 17, 2005, the plaintiff indicated he wanted an evaluation for catheter ablation for atrial fibrillation. (Tr. 153). Later, on June 17, 2005, Dr. Calkins ordered another echocardiogram which showed mild concentric left ventricular hypertrophy, moderate left atrial enlargement, mild mitral regurgitation, mild tricuspid regurgitation, mild pulmonary hypertension, mild aortic regurgitation, and mild aortic root dilatation. (Tr. 151, 152). Dr. Calkin's consultation note dated June 17, 2005 reflects that plaintiff suffered from

"mildly to moderately symptomatic" permanent atrial fibrillation, and ECG results indicated he could be considered a candidate for catheter ablation. (Tr. 148). Plaintiff's problem list included atrial fibrillation, high blood pressure, allergic rhinitis, and degenerative joint disease. (Tr. 146). As a consequence, the plaintiff underwent anticoagulation testing on June 23, July 7, and December 14, 2005, and June 6, 2006, and he was maintained on Coumadin, Altace, and Atenolol. (Tr. 145, 147, 219- 221). Medical records dated from May 2005 through March 2006, also indicate the plaintiff was treated by Alan Shorofsky, M.D., a board certified internist with Clinical Associates. (Tr. 206-209, 257-269). His office notes dated September 2005 and November 2005, reflect the plaintiff's symptoms relative to upper respiratory infection, bronchitis, and joint pain and swelling. (Tr. 257, 258, 260). Also, laboratory reports showed elevated triglycerides and homocysteine levels. (Tr. 206, 209).

Dr. Alan Shorofsky referred the plaintiff to Stephen Shorofsky, MD, Ph.D., a cardiologist, who examined the plaintiff and reviewed his medical records from Florida. (Tr. 204, 205). He reported to Dr. Alan Shorofsky that his examination revealed "an irregularly-irregular pulse of 72," and he summarized his assessment as:

> ... Mr. Ripley is a pleasant 51-year-old gentleman with now persistent atrial fibrillation ... He has failed several anti-arrhythmic medications including Amiodarone. Mr. Ripley is mildly symptomatic. I had a long discussion with [him] about an atrial fibrillation ablation versus remaining in atrial fibrillation and continuing anticoagulation. I ... explained all of the risk and benefits of the procedure. He is a candidate for the procedure with a potential success rate of about 70%. ...

(Tr. 204, 205). Dr. Alan Shorofsky also completed a Physical Capacities Evaluation ("PCE") form dated March 29, 2006. (Tr. 268, 269). Dr. Shorofsky stated that, "[D]ue to arthritic knee, unable to fully flex to enable to squat, crawl and climb. (Ladder) Unable to sit any length of time due to stiffness

in hips, back and neck." (Tr. 269). Dr. Shorofsky specified that the plaintiff could: stand/walk for one hour at a time for no more than two hours total during a workday; sit for one hour at a time for no more than 3 hours total during a work day; lift up to 20 pounds occasionally; occasionally bend; and never squat, crawl, or climb. (Tr. 268, 269).

David Axline, M.D., also with the "Heart Group," saw the plaintiff on March 6 and April 6, 2006, for continued management of his atrial fibrillation. (Tr. 270-272). On March 6, 2006, the plaintiff reported that "his heart rate increased in an exaggerated way during exercise," and that he has had increased palpitations, which awaken him from sleep." (Tr. 270). Examination revealed an irregular heart rate of 92, and a "soft diastolic murmur at the aortic area radiating to the apex." The diagnoses were chronic atrial fibrillation, moderate aortic insufficiency, and mild mitral regurgitation. Dr. Axline increased plaintiff's Atenolol in an attempt to better control the heart rate. Dr. Axline noted on April 6, 2006, that the plaintiff reported palpitations and increased heart rate to 120-140 during exercise. (Tr. 272). His heart rate at the time was irregular at 90, and Dr. Axline again increased the dosage of Atenolol.

A Cardiac " RFC" Questionnaire was completed by Dr. Axline, dated March 24, 2006.(Tr. 222). Dr. Axline indicated he had been treating the plaintiff since July 2002, and classified his heart condition as "Class III" relative to moderate aortic insufficiency, chronic atrial fibrillation, and tachycardia, associated with fatigue and palpitations resulting in marked limitation of physical activity. (Tr. 222, 223). Dr. Axline also indicated that "stress would aggravate [Mr. Ripley's] fatigue and tachycardia," and that thus, he was incapable of performing even low stress jobs, due to "intolerable" fatigue, beginning in July 2002. (Tr. 223, 226). Dr. Axline opined that the plaintiff's

impairments are likely to produce good days and bad days, and that he would likely be absent from work more than four days a month. (Tr. 226). The evidence of record also contains 14 pages of pharmacy printouts reflecting the plaintiff's consistently prescribed medications of Coumadin, Altace, Clarinex, and Atenolol covering the period from March 2003 to April 2006. (Tr. 278-291).

## B. SPECIFIC ISSUES

### I. THE ALJ ERRED IN FAILING TO COMPLY WITH THE MANDATORY PROCEDURES SET FORTH IN HALLEX I-2-5-42 IN SOLICITING POST-HEARING EVIDENCE FROM DR. SALOMON, A NON-EXAMINING MEDICAL EXPERT.

On September 6, 2006, the ALJ obtained completed interrogatories from Neal Salomon, M.D., a non-treating and non-examining medical expert, which were entered into the record as an exhibit. (Tr. 292-301). The ALJ relied on answers to these interrogatories in denying benefits in this case. (Tr. 18-19). However, the ALJ did not comply with the procedures set forth in HALLEX I-2-5-42 because he never transmitted the proposed interrogatories to the plaintiff's counsel prior to submission to Dr. Salomon and failed to advise plaintiff's counsel of his right to subpoena Dr. Salomon to a supplemental hearing.[4]

---

[4] HALLEX I 1-2-5-42 requires that the ALJ transmit the proposed interrogatories to the claimant or the claimants representative prior to releasing the interrogatories o the ME. HALLEX I-2-5-42©). Specifically, the ALJ is required to transmit the proposed interrogatories to the representative with a copy to the claimant, or to the claimant if not represented, to determine if they object to the use of interrogatories in general, object to any particular interrogatory, or wish to propose other interrogatories.

HALLEX I-2-5-42(c) also provides that when a claimants representative objects to the use of interrogatories, the ALJ must consider certain factors in ruling on this request. These factors include the "the preferability of live testimony as the method for obtaining expert opinion evidence," "whether a hearing is needed to address the claimant's or representative's allegations of

When the ALJ receives an ME's response to his or her interrogatories, the ALJ must:

(a) Provide a copy of the response to the claimant and the representative and notify them of the right to comment, submit further relevant evidence, propose additional interrogatories to the ME, and request a supplemental hearing with opportunity to question the ME at the supplemental hearing. The ALJ will provide the claimant and the representative with the opportunity to review the ME's response before making it an exhibit, unless they have waived the right to examine the evidence or the evidence supports a fully favorable decision.

(b) Rule on any objection or request by the claimant or the representative regarding the ME's response to the interrogatories. The claimant or representative may propose submission of additional interrogatories to the ME or request a supplemental hearing with opportunity to question the ME at the supplemental hearing. The claimant is entitled to ask the ME questions to the extent necessary to inquire fully into the matters at issue

HALLEX I-2-5-44 and. HALLEX I-2-7-30B also provides that the proffer letter to the claimant must:

1. [G]ive the claimant a time limit to object to, comment on, or refute the evidence, or exercise his or her rights with respect to requesting a supplemental hearing and the opportunity to cross-examine the author(s) of any post hearing report(s); and

2. [I]f the ALJ is proposing to enter medical reports into the record as exhibits, also inform the claimant of the right to:

   1. submit the new evidence to a treating source(s); and

   2. submit any comments from the treating source(s) to the ALJ for inclusion in the record.

---

bias on the part of the ME," and whether a hearing is needed to address questions about the ME qualifications. HALLEX I-2-5-42(C)(2)

HALLEX I-2-5-30 specifically discusses the benefits of live testimony vs. the use of interrogatories. The preferred method for obtaining ME or VE opinion is through life testimony at hearing. A hearing provides the claimant and the representative (if any) the opportunity to ask the ME or VE any questions material to the issues, including questions that arise for the first time during the hearing. Interrogatories are more limiting in that it is difficult to anticipate all questions that might arise.

HALLEX I-2-7-30C specifically provides that the ALJ shall "[e]nter into the record a copy of the proffer letter, a copy of the new evidence, and any comments received from the claimant and representative regarding the new evidence.

The plaintiff had the right to request a supplemental hearing and the opportunity to cross-examine Dr. Salomon but was denied that right. The Eleventh Circuit has held that due process is violated when a claimant is not given the opportunity to subpoena and cross-examine those who submit medical reports. *Hudson v. Heckler*, 755 F.2d 781, 784 (11 Cir. th 1985). The ALJ deprives a claimant of due process rights by not permitting the cross-examination of a post-hearing physician upon whose report the ALJ substantially relied upon in reaching his decision. *Demenech v. Secretary of the Dep't of Health & Human Servs.*, 913 F.2d 882, 884-85 (11th Cir. 1990). The Eleventh Circuit noted that cross-examination was of "extraordinary utility" since the post-hearing medical report directly contradicted the other medical evidence which supported the claimant's contentions. The ALJ failed to properly advise the plaintiff's prior counsel of his right to cross-examine Dr. Salomon at a supplemental hearing.

## II. THE ALJ'S DECISION SHOULD INCLUDE FINDINGS OF FACT ABOUT PLAINTIFF'S TRANSFERRABLE SKILLS[5]

The ALJ specifically found that the plaintiff is unable to perform his past relevant work as a regional sales manager and national sales manager. (Tr. 19). Therefore, the burden of proof shifted to the ALJ to prove that the plaintiff is capable, considering his age, education, and past work experience, of engaging in other work. *Welch v. Bowen,* 854 F.2d 436, 438 (11th Cir. 1988). The ALJ relied on the VE's testimony in finding that the Plaintiff has "acquired transferable skills from past

---

[5] When the issue of skills and their transferability must be decided, the adjudicator or ALJ is required to make certain findings of fact and include them in the written decision.

relevant work" and that these skills "are transferable to other occupations with jobs existing in significant numbers." (Tr. 19-20). The ALJ further relied on the VE's response to a hypothetical question in finding that the plaintiff can perform light work as a field and sales manager, general office clerk, information clerk, and cashier. (Tr. 20). However, the ALJ did not identify in his decision the specific skills that the plaintiff acquired in his past relevant work as required.

The VE characterized Mr. Ripley's job as a sales manager as sedentary work with an SVP of 8. (Tr. 388, 389). Based on the DOT and SOC categories, the VE testified that

> "[t]here are nine related positions that he would have skills for. As a field representative in business services, as a manager for vehicle leasing, as an area supervisor of sales. And then he obviously would have the skills to go to lesser skilled positions in sales and sale representation." (Tr. 389).

The VE further specified that the Plaintiff's acquired skills would transfer to jobs in customer service and clerical work, "knowing how to assess a market and do pricing, maintaining records," and obtaining required information. (Tr. 391). The ALJ asked the VE to consider someone with the plaintiff's background who:

> . . . could work at the light exertional level, where he would never climb ladders ropes or scaffolds, where he would not be exposed to temperature extremes of heat and cold or ambient air, nor to extremes of humidity, where he would not be exposed to concentrations of dust, fumes, or smoke . . . . (Tr. 389, 390).

The VE responded that such a person could do his past relevant work "once he was in the work site, he would be able to do his work without those exertional restrictions," in terms of the travel that was involved. (Tr. 390). She also testified that such a person could perform other jobs, such as a field or sales manager (DOT# 163.167-018), a sedentary job; and at the light level, he could work as a general office clerk, (DOT# 209.662-010); information clerk (DOT# 273.36-018); and as a light

cashier (DOT# 211.467-030). (Tr. 390). She felt that the jobs she identified represented the lowest stress levels, as "there's no position without stress." (Tr. 391, 392). However, she conceded that if a person were to miss work more than three days a month, "they would not be competitively employable." (Tr. 392)

Although the ALJ did not specifically state in his decision plaintiff's skills that were transferable to other jobs, the VE **did** specify those skills at the hearing,

The VE's testimony clearly states that plaintiff had transferable skills to other jobs including:

> ... customer service, knowing how to assess a market and do pricing, maintaining records, sales records, maintaining promotional records, that type of thing.
> (Tr. 391).

The VE further stated that the other jobs she believes plaintiff could do were "less skilled" but would require similar or the same skills. (Tr. 391).

Any omission by the ALJ in not reciting these skills in his decision is minor and the Court finds no substantial error. On remand, the ALJ should follow SSR 82-41 and state the transferable skills in his decision.

### III. THE ALJ ERRED IN FAILING TO PROVIDE GOOD CAUSE FOR REJECTING THE OPINION OF DR. AXLINE, PLAINTIFF'S TREATING PHYSICIAN.

Dr. Axline specified that during a work day, the plaintiff could sit/stand/walk for less than 2 hours; lift up to 10 pounds occasionally; rarely twist, stoop, crouch; never climb ladders or climb stairs; and that he would need to shift position at will, take unscheduled breaks, and elevate his legs with prolonged sitting. (Tr. 224). With these limitations, the plaintiff could not perform sustained work activities, 8 hours a day, 40 days a week. Dr. Axline also opined that the plaintiff would likely be absent from work more than four days a month. (Tr. 226). The VE testified that if an individual

missed more than three days a month, "they would not be competitively employable." (Tr. 392).

The regulations require that the findings of the treating physician as to the severity of an impairment be accorded controlling weight if they are well-supported by medically accepted clinical and laboratory diagnostic techniques and are not inconsistent with the other substantial evidence in the record. 20 C.F.R. § 404.1527(d)(2). The cited regulation acknowledges that more weight should be granted to the opinions of a treating source because:

> These [treating] sources are likely to be the medical professionals most able to provide a detailed, longitudinal picture of your medical impairment(s) and may bring a unique perspective to the medical evidence that cannot be obtained from the objective medical findings alone or from reports of individual examinations.

20 C.F.R. § 404.1527(d)(2).

The ALJ did not give specific and detailed reasons for rejecting the opinions of Doctors Alan Shorofsky, William Miles and David Axline.

### IV. THE ALJ'S CONCLUSORY CREDIBILITY FINDING IS INSUFFICIENT AS A MATTER OF LAW.

The ALJ determined that the plaintiff was "not entirely credible." (Tr. 17). However, the ALJ did not provide specific reasons for this credibility finding as required. The ALJ also failed to consider all of the factors set forth in 20 C.F.R. § 404.1529(c)(3) for evaluating subjective complaints, as required.[6]

---

[6] These factors include: (I) Your daily activities; (ii) The location, duration, frequency, and intensity of your pain or other symptoms; (iii) Precipitating and aggravating factors; (iv) The type, dosage, effectiveness, and side effects of any medication you take or have taken to alleviate your pain or other symptoms; (v) Treatment, other than medication, you receive or have received for relief of your pain or other symptoms; (vi) Any measures you use or have used to relieve your pain or other symptoms (e.g., lying flat on your back, standing for 15 to 20 minutes every hour, sleeping on a board, etc.); and(vii) Other factors concerning your functional limitations and restrictions due to pain or other symptoms.

Although the ALJ's opinion about plaintiff's credibility is supported in part by plaintiff's inconsistent testimony and the medical evidence, the ALJ did not give specific reasons for his opinion that plaintiff's statements about the " ...intensity, persistence and limiting effects of these symptoms are not entirely credible". (Tr. 17).

To the extent that the ALJ did not believe plaintiff's statements about pain, the ALJ was required to follow the specific rule for analyzing pain. SSR 96-7p.

The Eleventh Circuit has also held that a claimant may establish that his pain is disabling[7] through objective medical evidence that an underlying medical condition exists that could reasonably be expected to produce the pain. Once such an impairment is established, all evidence about the intensity, persistence, and functionally limiting effects of pain or other symptoms must be considered in addition to the medical signs and laboratory findings in deciding the issue of disability. If the Commissioner rejects the allegations of pain, "he must articulate explicit and adequate reasons" for doing so. *See Cannon v. Bowen*, 858 F.2d 1541, 1545 (11th Cir. 1988). If proof of disability is based upon subjective evidence and a credibility determination is critical to the decision, "the ALJ must either explicitly discredit such testimony or the implication must be so clear as to amount to a specific credibility finding." *Foote v. Chater*, 67 F.3d at 1553

## V. CONCLUSION

For the reasons stated above this case must be remanded to the Commissioner.

WHEREFORE, it is hereby **ORDERED** that the decision of the Commissioner be **REVERSED** and **REMANDED** pursuant to 42 U.S.C. § 405 (g) to allow the Administrative Judge to:

(1) Grant plaintiff's counsel the opportunity to cross-examine Dr. Salomon, the non-treating and non-examining medical expert;

(2) Make proper findings regarding plaintiff's transferrable skills, if any;

(3) Analyze the weight to be give to the opinions of Doctors Alan Shorofsky, William Miles and David Axline.

(4) Give specific reasons in assessing the plaintiff's credibility;

(5) Issue a new decision based on substantial evidence and proper legal standards.

(6) Take any other steps necessary to fully adjudicate the issues in this case.

The Clerk of the Court is hereby directed to enter a separate judgment pursuant to Rule 58 of the Federal Rules of Civil Procedure.

**DONE and ORDERED** in Chambers at Ft. Myers, Florida, this 30th day of April, 2010.

_____
Hon. Gustave J. DiBianco
U.S. Magistrate Judge

Copies to:
All parties of record
Counsel of Record